# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2016-CT-01502-SCT

*SHANNON CRAIG PARKER a/k/a SHANNON C.*
*PARKER a/k/a SHANNON PARKER*

*v.*

*STATE OF MISSISSIPPI*

## ON WRIT OF CERTIORARI

| | |
|---|---|
| DATE OF JUDGMENT: | 09/27/2016 |
| TRIAL JUDGE: | HON. JON MARK WEATHERS |
| TRIAL COURT ATTORNEYS: | CANDANCE L. RICKMAN |
| | BENJAMIN DODD THORNTON |
| | ZACHARY MONROE VAUGHN |
| | REBECCA PRUETT DENHAM |
| COURT FROM WHICH APPEALED: | FORREST COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: HUNTER NOLAN AIKENS |
| | GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: LAURA HOGAN TEDDER |
| DISTRICT ATTORNEY: | PATRICIA A. THOMAS BURCHELL |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 05/23/2019 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**MAXWELL, JUSTICE, FOR THE COURT:**

¶1.     Shannon Craig Parker appeals his aggravated-assault conviction and enhanced

sentence.  We assigned his appeal to the Court of Appeals, which affirmed.  However, the

appellate court was divided on one of the three issues Parker raised—whether the trial judge abused his discretion in denying Parker's request for a mental evaluation to pursue a possible insanity defense. We granted Parker's petition for writ of certiorari to review this issue.

¶2. After review, we hold the trial judge did not abuse his discretion when he denied Parker's pro se motion for a mental evaluation. Although given the opportunity to do so, Parker presented no concrete reason establishing the need for a mental evaluation to assist in the pursuit of a viable insanity defense. Instead, Parker offered only unsupported assertions of diminished capacity—a defense not recognized by Mississippi law. We thus affirm.

**Background Facts and Procedural History**

### I. Shooting

¶3. Eric and Edna Burkett were standing outside their home in Hattiesburg, Mississippi, when a white pickup truck stopped in front of them. The driver got out, and the Burketts asked if he needed help. The man mumbled something, grabbed a rifle, and shot Eric, wounding him. The man also fired shots at Edna but missed. Soon after, the police found the white truck in a nearby ditch. Its tires were still spinning. The driver, later identified as Parker, was in the truck. He was arrested and later confirmed by the Burketts as the man who attacked them.

¶4. Parker appeared to be under the influence. So police waited until the next day to interview him.[1] Parker, through a written statement, told police "I don't no [sic] victim.

_____

[1] Parker voluntarily waived his *Miranda* rights. *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966) (requiring that, prior to a custodial interrogation,

Don't even no [sic] victim. All I remember is sitting spinning." At the interviewing officer's recommendation, Parker underwent a mental evaluation. The evaluation was performed by a licensed professional counselor. Parker told the counselor that he had previously been treated for anxiety and depression. The counselor concluded that Parker "was verbal and responsive" and that "[h]is thought processes were rational."

## II. Rejected Plea

¶5. Although indicted on two counts of assault, the State elected to proceed only on the aggravated assault against Eric, with a five-year sentencing enhancement for using a firearm. *See* Miss. Code Ann. § 97-3-7(2)(a) (Rev. 2014) (aggravated assault); Miss. Code Ann. § 97-37-37(1) (Rev. 2014) (firearm enhancement). A week before the scheduled trial, Parker planned to plead guilty. But at the plea hearing, Parker claimed he had no recollection of the crime. And he maintained he could not verify the State's recitation of the facts. Under the circumstances, the trial judge determined he could not accept Parker's plea. At that point, the judge turned to pretrial matters.

¶6. One of these matters was defense counsel's prior indication that she did not intend to call an expert. At this point, Parker's counsel clarified that "this is where Mr. Parker and I disagree on the strategies of this trial." While Parker wanted a mental evaluation, counsel advised him he did not fall within "the parameters that the law requires in order to request a mental evaluation." Despite the time limit to make such a request having already passed,

the person being interviewed be warned that he has a right to remain silent, that any statement he makes may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed).

3

the trial judge permitted Parker to file a motion for a mental evaluation pro se. The judge also set the matter for a hearing the following Monday. The judge advised Parker that he may need to bring witnesses.

### III. Motion for Mental Evaluation

¶7. The hearing began with Parker's counsel confirming she and her co-counsel did not believe they could, as a matter of professional ethics, present Parker's motion. Specifically, counsel stated that, "I don't believe under *M'Naghten* that I would be able to present that motion." Parker then argued his motion pro se. He first attempted to rely on what he had written in his unsworn motion. The motion cited what the Burketts and arresting officers had allegedly said about this behavior the night he shot Eric. But the trial judge instructed Parker that he could not cite what other people allegedly said outside the courtroom as evidence. The trial judge then asked a series of probing questions about Parker's mental-health and prescription-drug history. Parker recollected he had suffered from anxiety and depression and once attempted suicide. At the end of the hearing, the trial judge concluded:

> Basically based on what the [trial] Court has to look at in terms of the treatment for anxiety and depression and the unfortunate event with attempting to commit suicide one time, there's nothing in anything, that information or the demeanor I've seen, the motions that have been filed, the court file itself, my interactions with Mr. Parker to lead me to believe that there's any rational basis for appointing a psychiatrist or psychologist to examine him for the purpose of determining either his competency or sanity.

¶8. The case proceeded to trial three days later. The jury found Parker guilty of aggravated assault and using a firearm during the commission of his crime. The judge

4

sentenced Parker to twenty years for the assault conviction, with an additional five years for the firearm enhancement.

### IV.   Appeal

¶9.   This Court assigned Parker's appeal to the Court of Appeals, which affirmed.  Parker presented three issues on appeal: (1) the trial judge erred in allowing the State's firearm expert to testify; (2) the trial judge abused his discretion in denying Parker's motion for a mental evaluation; and (3) the firearm enhancement violated the constitutional prohibition against double jeopardy.  While the appellate court unanimously agreed the first and third issues presented no reversible error, the court was equally divided on the second issue.  Based on this split, we granted Parker's petition for certiorari review.  Although Parker reasserted all three appellate issues in his petition, we limit our review to the issue of Parker's request for a mental evaluation.  *See Guice v. State*, 952 So. 2d 129, 133 (Miss. 2007) (recognizing this Court's "unquestionabl[e]" authority to limit the question on certiorari review).

### Discussion

### I.   Competency versus Insanity

¶10.   In his petition, Parker echoes the criticism made in the dissenting Court of Appeals opinion that "the trial court was focused on Parker's ability to stand trial rather than his sanity at the time of the incident." *Parker v. State*, No. 2016-KA-01502-COA, 2018 WL 1602585, at *9 (Miss. Ct. App. Apr. 3, 2018) (Tindall, J., dissenting).  The dissent to this opinion lodges the same complaint.

5

¶11.    We recognize, without question, that competency and sanity are two distinct concepts. *Sanders v. State*, 9 So. 3d 1132, 1137 (Miss. 2009).  Competency to stand trial is measured at the time of trial.  And its standard is "whether the defendant has 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and 'has a rational as well as factual understanding of the proceedings against him.'" *Martin v. State*, 871 So. 2d 693, 698 (Miss. 2004) (quoting *Dusky v. United States*, 362 U.S. 402, 80 S. Ct. 788, 4 L. Ed. 2d 824 (1960)).  By contrast, insanity—or, more precisely, a defendant's affirmative defense of not guilty by reason of insanity—is measured at the time of the criminal offense.  And its standard is the "*M'Naghten* rule." *Davis v. State*, 551 So. 2d 165, 173 (Miss. 1989).  Under this rule:

> To establish a defense on the ground of insanity, it must be clearly proved that at the time of committing of the act the accused was laboring under such defect of reason from disease of the mind as (1) not to know the nature and quality of the act he was doing, or (2) if he did know it, that he did not know that what he was doing was wrong.

*Id.* (citing *Hunter v. State*, 489 So. 2d 1086, 1090 (Miss. 1986); *Laney v. State*, 486 So. 2d 1242, 1245 (Miss. 1986)).

¶12.    First, we point out that just because Parker advanced his motion for mental evaluation on his claim that he may have been legally insane when he shot Eric does not put the trial court in error for also making an on-the-record ruling on Parker's competency. In fact, then-applicable Uniform Rule of Circuit and County Court Practice 9.06 mandated the trial judge *sua sponte* order a mental evaluation and conduct a competency hearing if the judge

6

had "reasonable ground to believe that [Parker was] incompetent to stand trial[.]"[2] Parker's actions leading up to the motion hearing at least raised the specter of his potential inability to consult with his court-appointed attorneys or understand the proceedings against him.[3] So we certainly do not fault the trial court for using the hearing to ensure no reasonable ground existed to believe Parker was incompetent to stand trial and face a jury seventy-two hours later.

¶13. Further, that the court assessed Parker's competency does not mean it failed to consider his potential insanity defense as a basis for granting a mental evaluation. The record shows the court permitted Parker to file his pro se motion out of time,[4] despite Parker's counsel informing the court she could not ethically file a motion for mental evaluation because she did not believe Parker met the conditions to receive one. The court was in fact

---

[2] *Cf. **House v. State***, 754 So. 2d 1147, 1151 (Miss. 1999) ("[T]rial courts are [constitutionally] obligated to conduct a competency hearing, either on the defendant's motion or sua sponte, if there is sufficient doubt about a defendant's competence." (citing ***Drope v. Missouri***, 420 U.S. 162, 180, 95 S. Ct. 896, 908, 43 L. Ed. 2d 103 (1975); ***Pate v. Robinson***, 383 U.S. 375, 378, 86 S. Ct. 836, 838, 15 L. Ed. 2d 815 (1966))).

[3] Parker had filed numerous pro se motions, including a "Motion to Be and Allow Shannon Craig Parker to Be Co-counsel Beside One Candance Rickmon Public Defender," "Motion of Release And/or Fire Public Defender Filed by Defendant," and "Motion for Preliminary Injunction/Transfer." And at the prior hearing, Parker had openly disagreed with his appointed counsel's assessment of Parker's potential insanity defense.

[4] Under the authority granted in then-applicable Rule 8.02, the trial court had set a due date of August 30, 2016, to file a motion for mental examination. *See* URCCC 8.02. Under then-applicable Rule 9.07, this was also the deadline to inform the State and the court that Parker intended to rely on an insanity defense. *See* URCCC 9.07. Parker did not inform the court he had wanted to file his motion for mental evaluation based on a potential insanity defense until two weeks later, on September 15, 2016, exactly one week before the scheduled trial.

7

cautious and set the motion for a pretrial hearing, telling Parker the court "intend[ed] to take testimony" and advising him he may have to call witnesses in support.

¶14. At the hearing, when Parker directed the court's attention to his claim that he was insane at the time of the crime, the court patiently responded, "All right, well, I'm here, and I'll sit here as long as we need to sit here to let you offer me proof that you have a mental problem or disease that would—that had some effect on why you don't remember what happened." Still, Parker failed to produce any proof. And the trial judge again reassured him, "I'll let you go and say whatever you wanted to say, and then I'm going to go through this and do what I want to do, and you be thinking, if there's *any other proof you want me to consider, any medical records, any witnesses, anything of that nature*, I'll sit here . . . till [five o'clock]. If we need to reconvene in the morning, we'll do that." (Emphasis added.) Despite the opportunity, guidance, and reassurance by the trial court, Parker made no attempt to call any witness. Nor did he attempt to submit any records.

¶15. After Parker failed to present any proof, the trial judge expressly concluded:

> [T]here's nothing in anything, that information or the demeanor I've seen, the motions that have been filed, the court file itself, my interactions with Mr. Parker to lead me to believe that there's any rational basis for appointing a psychiatrist or psychologist to examine him for the purpose of determining either his competency *or sanity*."

(Emphasis added.) Our review of the record demonstrates the trial judge thoroughly considered Parker's request for a mental evaluation to assist a potential insanity defense.

## II. Unsubstantiated Assertions

8

¶16.	As to the merits of this request, we agree with the Court of Appeals plurality that the trial court did not abuse its discretion when it denied Parker's motion for a mental evaluation.

¶17.	"This Court weighs on a case by case basis whether the denial of expert assistance for an accused is prejudicial to the assurance of a fair trial . . . ." *Johnson v. State*, 529 So. 2d 577, 590 (Miss. 1988). We "will grant relief only where the accused demonstrates that the trial court's abuse of discretion is so egregious as to deny him due process and where his trial was thereby rendered fundamentally unfair." *Id.*

¶18.	"[W]hen a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist" who will examine and assist him. *Ake v. Oklahoma*, 470 U.S. 68, 83, 105 S. Ct. 1087, 1096, 84 L. Ed. 2d 53 (1985). "Of course a defendant must come forth with concrete reasons, not unsubstantiated assertions that assistance would be beneficial." *Harrison v. State*, 635 So. 2d 894, 901 (Miss. 1994) (citing *Butler v. State*, 608 So. 2d 314, 321 (Miss. 1992); *Hansen v. State*, 592 So. 2d 114, 125 (Miss. 1991); *Griffin v. State*, 557 So. 2d 542 (Miss. 1990)).

¶19.	Parker relied exclusively on (1) his assertion he did not know the victim and could not remember anything about the night of the assault and (2) his own personal recollection about his mental-health history. This history included his taking prescription drugs for anxiety and depression and a suicide attempt three years earlier. But, as the Court of Appeals plurality aptly put it, Parker's history of treatment for anxiety and depression "has no apparent relevance to his ability to know right from wrong at the time of the offense." *Parker*, 2018

9

WL 1602585, at *6. *Cf.* **Sanders v. State**, 63 So. 3d 497, 506 (Miss. 2011) ("Just because a person is schizophrenic does not mean that person is **M'Naghten** insane." (citing **Laney v. State**, 486 So. 2d 1242, 1245 (Miss. 1986))). Nor does Parker's testimony that he does not remember shooting Eric establish **M'Naghten** insanity. Not being able to remember is not the same thing as not being able to distinguish right from wrong. *See, e.g.*, **United States v. Holsey**, 995 F.2d 960, 963 (10th Cir. 1993) (holding that the defendant's testimony that he "had 'blacked out' and did not remember robbing the bank" did not amount to evidence that the defendant suffered from a mental defect rendering the defendant "unable to appreciate the nature and quality or the wrongfulness of his acts"); **Williams v. State**, 228 S.E.2d 806, 807 (Ga. 1976) ("This testimony by appellant, that he does not remember what happened, does not require a charge on insanity."); **Jackson v. State**, 253 S.E.2d 874, 877 (Ga. Ct. App. 1979) ("Evidence that the defendant does not remember or was in a 'blanked out' state of mind during the commission of the acts charged is insufficient to raise the issue of insanity." (citations omitted)); **Sparkman v. State**, 469 S.W.2d 692, 696-97 (Tenn. Crim. App. 1970) ("Insanity and amnesia are distinct conditions, even though amnesia sometimes is an incident of insanity. Insanity is incapacity to discriminate between right and wrong, while amnesia is simply the inability to remember."); **Jeffley v. State**, 938 S.W.2d 514, 515 (Tex. Ct. App. 1997) ("Loss of memory, however, is insufficient to show insanity."); **Ex parte Saylee**, No. 03-18-00124-CR, 2019 WL 1413043, at *6 (Tex. Ct. App. Mar. 29, 2019) ("Not remembering conduct is distinct from not knowing that conduct is wrong and does not entitle an accused to the insanity defense."). This is especially so when the memory loss may be

10

attributable to voluntary intoxication or drug use.[5] *See Smith v. State*, 445 So. 2d 227, 231

(Miss. 1984) ("[I]f a person, when sober, is capable of distinguishing right and wrong and

voluntarily intoxicates or drugs himself to the extent that he does not know or understand his

actions, e.g., steals, robs, or murders, he is responsible and he may be convicted and

sentenced for the crime." (citing *McDaniel v. State*, 356 So. 2d 1151, 1161 (Miss. 1978)

(Sugg, J., specially concurring))); *Patterson v. State*, 127 So. 3d 1124, 1131 (Miss. Ct. App.

2013) (holding that not being able to remember committing the crime due to voluntary

intoxication is not a viable insanity defense).

¶20.    At best, Parker's testimony suggested "diminished capacity"—a defense that is not

recognized under Mississippi law. *Cannaday v. State*, 455 So. 2d 713, 720 (Miss. 1984);

*Patterson*, 127 So. 3d at 1131.  When it come to *insanity*, however, we agree with the Court

of Appeals plurality that Parker failed to present "any concrete reason" establishing a mental

evaluation was necessary or that Parker had a viable insanity defense.  *Parker*, 2018 WL

1602585, at *6.  Thus, "given the broad discretion afforded to trial courts in determining

whether to order a mental evaluation[,]" we find no reversible error.  *Harden v. State*, 59 So.

3d 594, 603 (Miss. 2011).

### III.    Hearsay

¶21.    As to Parker's other statements—which the dissent suggests should have been

considered competent evidence in support of Parker's motion—the trial judge did not abuse

---

[5] Albeit months after the crime, Parker testified under oath that, if he in fact did what the State accused him of doing, then the judge should punish him to the full extent of the law—indicating that, when not under the influence of any substance, he knew right from wrong.

his discretion in excluding them as hearsay. Again, Parker did not call any witnesses. Instead, he merely offered an unsworn pleading as support, which contained what he alleged were statements from others. The judge explained that Parker could not offer out-of-court statements from *others* about how he was acting that night to *prove* in fact how he acted. As the trial court correctly described it, what Parker was attempting to offer was textbook hearsay. Parker wanted to offer statements by the arresting officers and victims, made out of court, to prove the truth of what they had asserted—namely, that Parker appeared to be "belligerent," that Parker "appeared to be under the influence of some type of drug or alcohol," and that Parker had been "talking in a strange language" and "mumbling." *See* Miss. R. Evid. 801(c) ("'Hearsay' means a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement.").

¶22. The fact Parker himself supposedly could not recollect his behavior or state of mind when he shot Eric does not change the fundamental evidentiary rule that he could not testify about what *others* witnessed. Of course, Parker could have called the arresting officers and victims to testify about what Parker had said that night to prove Parker's state of mind.[6] If he had done so, *their* testimony would not be hearsay, because it would have been offered not to prove what Parker said was true but instead to prove Parker's incoherence. But, though he was given the opportunity to do so, that is not what Parker did. Instead, Parker

---

[6] We note the Burketts and arresting officers did testify at trial. But their later in-court testimony does not change the fact that the statements cited in the pretrial motion were hearsay.

tried to shoehorn in unsworn out-of-court statements from others aimed at proving what was asserted about Parker's behavior was in fact true. Again, with respect for the dissent, this is hearsay.

¶23. The hearsay-exception cases the dissent cites are clearly distinguishable. For example, in *Peterson v. State*, 671 So. 2d 647, 657 (Miss. 1996),[7] a sexual-battery case, the defendant tried to introduce a statement his victim made to him the night of the assault that earlier that evening someone had called her a "slut and a whore." The defendant offered this evidence "as relevant to [his] state of mind on the night of the offense." *Id.* at 651. More specifically, he offered the evidence to show what he "could expect regarding sexual relations." *Id.* at 657. This Court affirmed the irrelevance and inadmissibility of this statement in a sexual-battery case. But we noted the out-of-court statement was not hearsay because it was "offered to prove the defendant's state of mind, *rather than* the truth of its assertions." *Id.* at 657 (emphasis added). In other words, the statement was offered to show the defendant's claimed belief that the victim was promiscuous, not that she was in fact and truth a "slut and a whore."[8] *Id.*

---

[7] As the dissent acknowledges, Peterson has been superseded by rule on other grounds as recognized in *Caston v. State*, 949 So. 2d 852, 855-56 (Miss. Ct. App. 2007).

[8] The same is true for *Eselin-Bullock & Associates Insurance Agency v. National General Insurance Co.*, 604 So. 2d 236, 242 (Miss. 1992), in which this Court explicitly held that there was "no issue about the truth of the matter asserted." *Eselin-Bullock* was a tortious-interference-with-business-relations case between an insurance agency, Eselin-Bullock, and the insurer it represented. Following Hurricane Elena in 1985, the insurer decided it was cost-prohibitive to reinsure along the Mississippi Gulf Coast. The insurer sent letters directly to clients notifying them that their "policies were being cancelled because [the agency] no longer represented [the insured]." *Id.* at 239. At trial, one of the

13

¶24. Here, by sharp contrast, Parker offered the out-of-court statements in an effort to prove he *truly* was acting "belligerent," he *in truth* "appeared to be under the influence of some type of drug or alcohol," and he was *in fact* "talking in a strange language" and

---

agents tried to testify about the phone calls he received from upset clients. He explained the clients blamed the agency about the cancellations of their policies and thought, based on the wording on the letters, that the agency was going out of business. The trial court sustained the insurer's objection on hearsay grounds. This Court reversed, holding the out-of-court statements by clients were not hearsay because "[t]hese statements were not offered to prove that the clients were truly upset, that the clients in truth blamed Eselin-Bullock for their cancellations, or that the clients in truth believed that Eselin-Bullock was going out of business." *Id.* at 242. Instead, "[t]hese statements were offered simply to prove that such statements were made by Eselin-Bullock clients in response to cancellation notices."

As to the three non-Mississippi cases the dissent cites, they too are distinguishable because the out-of-court statements were not being offered to prove the truth of the matter asserted. ***United States v. Detrich***, 865 F.2d 17 (2d Cir. 1988) was a federal drug-trafficking case in which the defendant claimed he had brought a suit back from India as a favor for a friend whose cousin was getting married. He was met at the airport by the Drug Enforcement Administration, which found heroin hidden in the shoulder pads of the suit. The Second Circuit held the defendant should have been allowed to introduce the cousin's out-of-court statement to the DEA that he was getting married. "Without regard to the truth of [the cousin's] marriage plans," the statement was circumstantial evidence of the defendant's state of mind and his claim he thought he was performing an innocent a favor. *Id.* at 21.

***Lambert v. State***, 888 P.2d 494 (Okla. Crim. App. 1994) was a death-penalty appeal in which the defendant argued the State's expert who performed the competency evaluation should not have been allowed to testify that he (the expert) relied, in part, on conversations with an accomplice. The Oklahoma Court of Criminal Appeals rejected this argument because there was "no assertion that the information related by [the expert] was offered to prove the truth of the matter asserted." *Id.* at 501. Rather, the accomplice's statement "was used to evaluate the [defendant's] state of mind, and to show his ability to plan." *Id.*

Finally, ***State v. Crafts***, 627 A.2d 877 (Conn. 1993) was a gruesome murder case in which the state's theory was that the defendant murdered his wife upon learning she planned to divorce him. The state introduced five witnesses who testified that the victim had told them that, if something happened to her, they should not believe that it was an accident. In rejecting the defendant's hearsay claim, the Supreme Court of Connecticut noted that "[a]n out-of-court statement is hearsay . . . *only* if it is offered to prove the truth of the matter asserted in the statement." *Id.* at 886 (emphasis added). And in that case, "because the state offered the evidence to establish only the victim's state of mind, the statements were not hearsay." *Id.*

14

"mumbling" the night he shot Eric. So the statements *were* inadmissible hearsay. *See* Miss. R. Evid. 801(c), 802. Thus, we find the trial court did not abuse its discretion in refusing to consider this incompetent evidence when making the discretionary decision to deny Parker's unsupported motion for a mental evaluation.

## Conclusion

¶25. On the limited issue of the trial judge's denial of Parker's motion for a mental evaluation, we find no reversible error. We therefore affirm the judgments of the Forrest County Circuit Court and the Court of Appeals.

¶26. **AFFIRMED.**

**RANDOLPH, C.J., COLEMAN, BEAM, CHAMBERLIN AND ISHEE, JJ., CONCUR. KITCHENS, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KING, P.J. GRIFFIS, J., NOT PARTICIPATING.**

**KITCHENS, PRESIDING JUSTICE, DISSENTING:**

¶27. The majority erroneously affirms the trial court's denial of Parker's motion for a mental evaluation, finding the evidence insufficient. Because Parker made a satisfactory showing concerning the question of his sanity, the trial court abused its discretion. I respectfully dissent from the majority's holding and would find that Parker's *pro se* motion for a mental evaluation should have been granted.

¶28. On January 28, 2016, Eric and Edna Burkett were outdoors when Parker, driving a white pickup truck, stopped in front of their home. The Burketts, who did not know Parker, asked whether they could help him. The Burketts testified that Parker was acting "a little strange." He had started "talking in a strange language" and "mumbling incoherently." Parker

15

took a .22 caliber rifle from his truck and fired three shots at the Burketts, one of which struck Eric Burkett in the stomach. A neighbor of the Burketts called the police.

¶29.  Approximately fifteen minutes later, law enforcement officers found Parker's truck in a ditch less than half a mile from the Burketts' home. He was sitting in the vehicle and its tires were spinning. Parker did not try to flee when officers ordered him to exit the truck. A police officer testified that, when Parker stepped out of his vehicle, he "stood there and stared at [the officer]." The police officer went on to testify that Parker "was kind of wobbly" and had difficultly standing straight, ultimately falling to the ground. Parker then was arrested.

¶30.  At the police station that night, a detective chose not to try to obtain a statement from Parker. According to the detective, one of the reasons she did not interview Parker was because of her belief that his statement could not have been voluntarily or knowingly made at that time. She speculated that Parker might have been under the influence of some substance. No evidence was obtained from the vehicle or the scene that supported this suspicion. Parker's blood was not tested for alcohol or drugs. On the following day the detective obtained a handwritten statement from Parker that said, simply, "I don't no [sic] victim. Don't even no [sic] victim. All I remember is sitting spinning." After meeting with Parker, the detective recommended that mental health personnel evaluate him.

¶31.  A brief evaluation did occur the day after the incident. The report stated that Parker had been treated for depression and anxiety for years and that his current medications were Wellbutrin, Viibryd, and Xanax. The report did not address Parker's mental state on the night of the incident, and nothing suggests that the evaluation was performed to assess his

16

mental competency to stand trial. The report was prepared by a person whose name is followed by "LPC," which I believe stands for Licensed Professional Counselor, and "NCC," which I believe stands for National Certified Counselor. She recommended that Parker be seen by a "medical provider at the jail for placement on medications treating his [symptoms] of anxiety and depression."

¶32. During a pretrial hearing in circuit court, Parker told the trial judge that he had no recollection of the shooting and did not know whether he had committed the crime. Parker told the judge that he wanted a mental evaluation to support an insanity defense. The court gave Parker an opportunity to prepare his motion, which he drafted by 5:00 p.m. the following evening.[9] A few days later, Parker argued his own motion to the court.

¶33. Parker began his argument by reading his three-page motion. The motion asserted that, at the time of the offense, Parker "was in no right state of mind" and was not "able to know right from wrong." Parker's motion noted that arresting officers had described him as "belligerent" and had thought that he "appeared to be under the influence of some type of drug or alcohol." The motion noted also that the Burketts had told police that he was "talking in a strange language" and "mumbling incoherently." Parker's motion stated further that he had been treated for depression and anxiety and had been prescribed Wellbutrin, Viibryd, and Xanax. Finally, Parker requested a mental examination and an expert to testify in support of his insanity defense.

---

[9]Parker had been found by the trial court to be indigent. Although he had a court-appointed attorney, Parker drafted and filed the motion *pro se* because his attorneys, according to Parker, did not want to pursue an insanity defense. Both attorneys were present at the motion hearing.

¶34. After reading his motion aloud, Parker testified to a history of mental-illness-related hospitalizations, the names or locations of medical facilities at which he had received treatment, a prior suicide attempt, and a number of medications he had taken over the years for anxiety, depression, and psychosis. Parker also testified that, at the time he assaulted the Burketts, he was under a doctor's care and on medication for anxiety and depression. In addition, Parker testified that he received Social Security disability benefits for physical and mental issues. Parker testified he had no idea whether he had been under the influence of alcohol or drugs.

¶35. Throughout the hearing, the circuit judge focused on Parker's mental competency to stand trial rather than on his alleged insanity at the time of the offense.[10] Parker made it clear that he was not questioning his competency to stand trial.[11] Ultimately the circuit court denied Parker's motion: "I find that Mr. Parker is competent to stand trial at this time, and the trial will go forward on Thursday[.]" Parker was tried, convicted, and sentenced. A plurality of

---

[10]The circuit court made the following statements: "I want you to tell me . . . [the reasons] you have a mental condition[] that leads you to be incompetent to stand trial or assist your attorneys[.]"; "[S]o are you competent[?] [D]o you feel like you're competent to assist your attorneys in preparing your defense?"; "[I]n determining whether or not the defendant is competent to stand trial and assist in his trial . . . the [c]ourt has observed the defendant's demeanor and conduct[.]"; "I have failed to observe or perceive any untoward conduct on the part of the defendant."; "I find no basis to deem Mr. Parker incompetent to assist in his defense or proceed to trial[.]"; "[S]pecifically the [c]ourt finds that Mr. Parker appears to have sufficient present mental - - present sufficient - - present ability to confer with his attorneys[.]"; "Therefore, I find that Mr. Parker is competent to stand trial at this time[.]"

[11]Parker made the following statements: "Judge, this has nothing to do with me standing trial."; "Judge, like I stated, this has nothing to do with this time and period right now. It has to do with" the time of the crime; "But, Judge, we're not talking about what I was capable of doing then or now. We're talking about what happened on that night."

18

the Court of Appeals affirmed; the Court of Appeals was evenly divided—almost; one judge voted, without opinion, to affirm in part and dissent in part.[12] ***Parker v. State***, No. 2016-KA-01502-COA, 2018 WL 1602585, at *1, *7 (Miss. Ct. App. Apr. 3, 2018).

¶36. A trial court's ruling on a motion for a mental evaluation is reviewed under an abuse of discretion standard. ***Wheeler v. State***, 536 So. 2d 1347, 1354 (Miss. 1988). In doing so, we examine "all of the evidence" that was before the trial court. ***Richardson v. State***, 74 So. 3d 317, 323 (Miss. 2011). We also determine whether the trial court "applied the correct legal standard." ***Greater Canton Ford Mercury, Inc. v. Lane***, 997 So. 2d 198, 202 (Miss. 2008) (quoting ***Burkett v. Burkett***, 537 So. 2d 443, 446 (Miss. 1989)).

¶37. Parker's motion for a mental evaluation raised specifically the issue of his sanity at the time of the offense. In determining sanity in criminal cases Mississippi utilizes the common law ***M'Naghten*** test.[13] "Under the ***M'Naghten*** test, the accused must be "'laboring under such defect of reason from disease of the mind as (1) not to know the nature and

---

[12] Now-Presiding Judge Wilson authored the plurality opinion. Then-Chief Judge Lee, then-Presiding Judge Griffis, now-Chief Judge Barnes, and Judge Fair concurred. Judge Greenlee concurred in part and dissented in part without separate written opinion. Judge Tindell dissented with separate written opinion, joined by then-Presiding Judge Irving and Judges Carlton, Greenlee, and Westbrooks.

[13] The ***M'Naghten*** test was announced first by the English House of Lords. ***M'Naghten's Case*** (1843) 8 Eng. Rep. 718, 10 Clark & F. 200. This Court expressly adopted the ***M'Naghten*** test in 1955. ***Johnson v. State***, 223 Miss. 56, 67, 76 So. 2d 841, 844 (1955) ("We apply the test of the leading English case known as ***M'Naghten***'s case, which is the majority rule." (citing 14 Am. Jur. *Criminal Law* §§ 38-40)). The ***Johnson*** Court adopted the test, noting that earlier Mississippi decisions had recognized and applied the substance of the rule. *See, e.g.*, ***Eatman v. State***, 169 Miss. 295, 153 So. 381, 381 (1934).

quality of the act he was doing or (2) if he did know it, that he did not know that what he was doing was wrong."' *Hearn v. State*, 3 So. 3d 722, 738 (Miss. 2008) (quoting *Woodham v. State*, 800 So. 2d 1148, 1158 (Miss. 2001) (quoting *Roundtree v. State*, 568 So. 2d 1173, 1181 (Miss.1990))).

¶38.    We apply the *M'Naghten* test in light of the minimum constitutional protections afforded by the due process of law provisions of the Fourteenth Amendment to the United States Constitution; our analysis necessarily is bound by the United States Supreme Court's interpretation of that amendment. *See Penick v. State*, 440 So. 2d 547, 551 (Miss. 1983) ("[W]e [are] bound to follow the holding of the U.S. Supreme Court's interpretations of the Fourt[eenth] Amendment to the U.S. Constitution."); *see also*, Miss. Const. art. 6, § 155.[14] Respecting the question of an indigent defendant's claim of insanity at the time of the offense, the United States Supreme Court has held

> This Court has long recognized that when a State brings its judicial power to bear on an indigent defendant in a criminal proceeding, it must take steps to assure that the defendant has a fair opportunity to present his defense. This elementary principle, grounded in significant part on the Fourteenth Amendment's due process guarantee of fundamental fairness, derives from the belief that justice cannot be equal where, simply as a result of his poverty, a defendant is denied the opportunity to participate meaningfully in a judicial proceeding in which his liberty is at stake. . . .
>
> . . . .

---

[14]The United States Constitution, to which this Court unquestionably is bound, establishes a minimum standard for state courts. Though unnecessary here, "We are empowered by our state constitution to exceed federal minimum standards of constitutionality and more strictly enforce [constitutional rights]." *Downey v. State*, 144 So. 3d 146, 151 (Miss. 2014).

> We therefore hold that when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense.

*Ake v. Oklahoma*, 470 U.S. 68, 76, 83, 105 S. Ct. 1087, 1092-96, 84 L. Ed. 2d 53 (1985).

¶39.   Before the Court is the question of whether Parker sufficiently demonstrated to the trial judge that his sanity at the time of the offense was "seriously in question." *Id.* at 82. In analyzing this issue, we review the evidence that was before the circuit court.

### A.   Evidence Considered by the Circuit Court

¶40.   As noted above, Parker submitted a *pro se* motion for mental evaluation and testified in support of his motion. Parker testified about his history of mental-illness-related hospitalizations, the names or locations of medical facilities at which he had received mental health treatment, a prior suicide attempt, and a number of medications he had taken over the years for anxiety, depression, and psychosis. Some of the prescribed drugs Parker testified he had taken were Wellbutrin, Viibryd, and Xanax. Parker testified also that, at the time he assaulted the Burketts, he was under a doctor's care and was on medicine for anxiety and depression.[15] In addition, Parker testified that he received Social Security disability benefits for physical and mental issues. Finally, Parker testified that he had no recollection of what had happened during the shooting and that he did not remember having been there.

### B.   Evidence Not Considered by the Circuit Court

---

[15]Of significance, perhaps, is that Parker did not testify, and he did not tell the LPC/NCC examiner that he was, at the time, taking medication for psychosis.

21

¶41.   The circuit court made no mention of having considered any of the following additional evidence before denying Parker's motion. Parker testified that the arresting officers had described him as "belligerent" and had thought that he "appeared to be under the influence of some type of drug or alcohol." Accordingly, law enforcement personnel did not attempt to obtain a statement from Parker on the night he was taken into custody. Parker also testified that Eric Burkett had said that Parker was "talking in a strange language and mumbled." Parker further testified that Edna Burkett had said Parker was "mumbling" and had "continued to mumble someone's name."

¶42.   The circuit court did not consider that evidence because it determined, *sua sponte*, that all of the statements were inadmissible hearsay: "[W]hat you've done, Mr. Parker, is [that] you [have] cited a bunch of people and what they allegedly said, but they're not in the courtroom, and that's hearsay. . . . and I don't see that there's an exception to the rule against hearsay." With respect, the trial judge was mistaken in his evidentiary analysis.

¶43.   "Hearsay" is defined as "a statement that (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." M.R.E. 801(c). Parker did not offer into evidence the above statements to prove the truth of the matters asserted.[16] He was not trying to prove that he was "under the influence of some type of drug or alcohol" or that he actually was

---

[16]Now-Chief Judge Barnes of the Court of Appeals has expounded on this problem: "All too often, we see records where a witness is informed he 'can't say what anyone else said' without any attempt to determine whether the statements are being used to prove the truth of the matter." *Harrell v. State*, 179 So. 3d 16, 22–23 (Miss. Ct. App. 2014) (Barnes, J., dissenting).

"talking in a strange language" and "mumbling." He offered the statements to prove, as best he could, his state of mind at the time of the offense. M.R.E. 803(3) (Then-Existing Mental, Emotional, or Physical Condition).

¶44.    Under the applicable exception, Mississippi Rules of Evidence 803(3), statements "offered to prove the defendant's state of mind, rather than the truth of [the matters] assert[ed] . . . . [are] not hearsay under the Mississippi Rules of Evidence." *Peterson v. State*, 671 So. 2d 647, 657 (Miss. 1996), *superseded by rule on other grounds as recognized in Caston v. State*, 949 So. 2d 852, 855-56 (Miss. Ct. App. 2007). *See generally Eselin-Bullock & Assocs. Ins. Agency, Inc. v. Nat'l Gen. Ins. Co.*, 604 So. 2d 236, 242 (Miss. 1992). *See also United States v. Detrich*, 865 F.2d 17, 21 (2d Cir. 1988) (when "the statement is offered as circumstantial evidence of [the defendant's] state of mind, it does not fall within the definition" of hearsay); *Lambert v. State*, 888 P.2d 494, 501 (Okla. Crim. App. 1994) ("The record also contains testimony from Dr. Goodman that his conversations with Hain were relied upon in determining [the defendant's] competency, and evaluating his mental state. There is no assertion that the information related by Goodman was offered to prove the truth of the matter asserted. Rather, the statement was used to evaluate [the defendant's] state of mind . . . ."); *State v. Crafts*, 627 A.2d 877, 886 (Conn. 1993) ("A statement that is offered to establish circumstantially the state of mind of the declarant is not offered for the truth of the statement.").

¶45.    The majority finds that Parker offered the out-of-court statements for the purpose of proving that he was, in fact, belligerent, incomprehensible, and generally unable to control

23

himself, *inter alia*. The majority asserts this properly was deemed inadmissible hearsay without exception, and distinguishes the above-cited cases illustrating the state-of-mind exception.

¶46.    However, the record makes clear that Parker did not offer the statements to prove truth of the matter asserted, nor did he offer them to prove his sanity, or lack thereof. The out-of-court statements were offered to show Parker's state of mind during and soon after his bizarre, motiveless assault on the Burketts. He had no recollection of the events, but other witnesses did. This was apparent from Parker's testimony at the pretrial hearing:

> [Court]: . . . I want you to tell me what it is about this case and your involvement in it that could convince me that you have a mental condition, that leads you to be incompetent to stand trial or to assist your attorneys in the defense of your case?
>
> . . . .
>
> [Defendant]: . . . I have no recollection of any idea of what I was doing in Palmer's Crossing that night. I don't even remember being there. I don't have any recollection of what happened. *My mental capability at that time of said crime, I have no idea. I was not even at myself. I mean there's people that put -- that state this, and me, myself, I have no recollection*. That's a 24-hour period of time that when I was brought to Forrest County Jail and then woke up the next morning in the holding cell.

(Emphasis added.)

¶47.    These contemporaneous statements of Parker's are about his then-existing mental, emotional, or physical condition at the time of the shooting. Parker testified he had no awareness or memory of his actions. It does not follow that the statements were offered to prove the fact of his *behavior*—as the majority finds. The out-of-court statements provided by several witnesses relate to Parker's mental condition or state of mind at the time of and

24

soon after the tragic shooting. Nor does the fact that Parker testified about what others witnessed preclude the statements' admissibility. These statements are the kind contemplated by Rule 803(3), a well-known exception to the rule against hearsay.

¶48. From all indications, Parker was lucid and rational at the time he stood before the trial court and begged for a mental health evaluation by a court-appointed expert. Parker did not claim that he was mentally incompetent to stand trial or to assist counsel with his defense. Thus, the trial judge was addressing a question that was not being asked, while leaving unanswered the all-important question of whether Parker had made a sufficient showing of his state of mind at the time of his assault upon the Burketts to warrant a mental health examination by a qualified, court-appointed mental health professional. The judge's failure to consider Parker's rendition of relevant witness statements made in close proximity in time to the assault was error which was, in significant part, due to the judge's erroneous belief that the statements were inadmissible hearsay.

### C.   Application of the Rule to the Evidence Presented

¶49. Parker demonstrated to the trial judge that his sanity at the time of the offense was "seriously in question." *Ake*, 470 U.S. at 82. To that end, Parker adduced the following evidence:

- Parker had no recollection of what had happened on the night of the crime. This was neither questioned nor rebutted by the State.

- Parker did not remember being at the scene of the crime. This was not contradicted.

- Parker had said, without contradiction, that he did not know the victim, Eric Burkett.

- There was no indication that Parker had any motive to shoot Eric Burkett.

- The investigating officer believed that Parker, on the night of the crime, was not in a state of mind in which he knowingly and voluntarily could give a statement.

- The arresting officers described Parker as "belligerent."

- The arresting officers thought Parker "appeared to be under the influence of some type of drug or alcohol."

- The Burketts observed Parker "talking in a strange language" and "mumbling."

- Parker had a history of mental illness.

- In the past, Parker had been taking a number of medications for anxiety, depression, psychosis, and mental illness, including Wellbutrin, Viibryd, and Xanax.

- Parker told the LPC/NCC examiner that he was taking prescribed medications for anxiety and depression.

- Parker had attempted suicide on a prior occasion.

- Parker had been receiving Social Security disability benefits for physical and mental illness.

¶50.    Based on the above evidence, I would find that Parker more than adequately "demonstrate[d] to the trial judge that his sanity at the time of the offense [was seriously in question.]"[17] *Id.* at 82-83. *See also* **Liles v. Saffle**, 945 F.2d 333, 341 (10th Cir. 1991) (similar evidence required *habeas* relief for trial court's failure to order mental evaluation under *Ake*); **De Freece v. State**, 848 S.W.2d 150, 151 (Tex. Crim. App. 1993) (evidence that

_____

[17]The State did not rebut or challenge any of Parker's evidence. The trial judge asked, "All right, does the State have anything?" The prosecutor responded, "We have no proof to offer, Judge. Just argument."

26

defendant "heard voices he 'couldn't overcome'" and previous diagnosis of mental illness sufficient to require reversal of trial court's denial for mental evaluation under *Ake*); *Lindsey v. State*, 330 S.E.2d 563 (Ga. 1985) (evidence that defendant had a history of mental problems and that defendant had been diagnosed as a paranoid schizophrenic and had been prescribed antipsychotic medications sufficient to require reversal of trial court's denial of mental evaluation under *Ake*).

¶51.   As explained in *Ake*, a defendant need make only a "*preliminary showing* that his sanity at the time of the offense" is at issue in order to trigger the constitutional protection of "access to a psychiatrist's assistance." *Ake*, 470 U.S. at 74 (emphasis added). It is beyond any reasonable argument that Parker's proffered evidence amounted to a sufficient *preliminary showing*. And once such a preliminary showing has been made, an indigent defendant must be given the "raw materials integral to the building of an effective defense." *Ake*, 470 U.S. at 77. This analysis comports with the *M'Naghten* test, *Hearn*, 3 So. 3d at 738, and other principles of constitutional fairness. *Lowe v. State*, 127 So. 3d 178, 181 (Miss. 2013) ("We will not hesitate to reverse a trial court's denial of expert assistance to an indigent defendant when the lack of expert assistance denied the defendant due process such that the trial was rendered fundamentally unfair." (citing *Fisher v. City of Eupora*, 587 So. 2d 878, 883 (Miss. 1991))). *See also Bishop v. State*, 96 Miss. 846, 52 So. 21, 22-23 (1910).

¶52.   To be clear, this preliminary showing is far from dispositive of the question of whether Parker has presented a viable insanity defense, or that he will ever do so. That "ultimate issue is to be determined by the jury." *Billiot v. State*, 454 So. 2d 445, 463 (Miss.

1984). As the majority observes, Parker's ability or inability to recall his actions does not affect whether he could distinguish right from wrong at the time of the alleged crime. But Parker has made a sufficient preliminary showing on the question of his sanity at the time of the offense to warrant a mental health evaluation under *Ake*. Indeed, part of the reason for conducting a mental evaluation is to help the defendant determine whether an insanity defense is viable. *Liles*, 945 F.2d at 340 ("One of the functions of [] a court-appointed psychiatric expert, therefore, is to assist the defense in determining whether an insanity defense is viable or warranted under the circumstances of a particular case." (citing *Ake*, 470 U.S. at 82)).

¶53. Parker questioned his own sanity and thus provided the trial court ample reason to require a mental health examination by a court-appointed professional in accordance with *Ake*. For these reasons, I dissent and would reverse Parker's conviction and sentence and would remand the case to the Forrest County Circuit Court for a new trial.

**KING, P.J., JOINS THIS OPINION**.